UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:16-CV-00467-GNS-HBB


KAREN GAYER,
As Administratrix of the Estate of
Cody Baker, deceased                                                    PLAINTIFF


v.


UNITED STATES OF AMERICA                                                DEFENDANT


## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (DN 41). The motion is ripe for adjudication. For the reasons outlined below, the motion is **GRANTED**.

## I.      STATEMENT OF FACTS AND CLAIMS

This case involves the death by suicide of Iraq War veteran Cody Baker ("Baker"). (Compl. ¶¶ 1-2, DN 1). Karen Gayer ("Plaintiff") is the Administratrix of Baker's estate and brought this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346. Plaintiff alleges negligent treatment on the part of the Veterans Administration ("VA") led to Baker's suffering which was the direct and proximate cause of his suicide. (Compl. ¶¶ 19-29).

Baker served in Iraq from 2006 through 2008. (Compl. ¶ 2). While on active duty, he experienced numerous traumatic events, including an encounter with an improvised explosive device when Baker's vehicle received a direct hit. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 2, DN 46-2 [hereinafter Krause Memo]). Gayer, who is Baker's mother, testified that during his service Baker was tasked with picking up and bagging the body parts of four deceased comrades and was involved in an incident where a child was killed. (Gayer Dep. 34:7-15, June 13, 2017, DN 46-1).

In December 2008, Baker first sought treatment from the VA. (VA Medical Records 2, DN 41-4; Van Natta Dep. 65:14-19, June 21, 2017, DN 46-3). Baker received screening to determine his risk for suicide, depression, and post-traumatic stress disorder ("PTSD"), which were all negative. (VA Medical Records 55-58; Grantz Dep. 70-73, Feb. 22, 2018, DN 41-2). Over the following two years, Baker returned to the VA for treatment of various physical ailments. (VA Medical Records 2). On June 18, 2010, Baker again screened negative for PTSD, depression, and suicide, giving negative responses to all questions except one where Baker expressed he had suffered from nightmares. (VA Medical Records 39-41). Baker did not test positive on any screening despite the fact that PTSD, depression, alcohol use, and similar tests are designed to be generalized and to err on the side of caution. In other words, if a patient is borderline, the evaluations will reflect a positive finding. (Van Natta Dep. 26:4-8). Consistent with these test results, neither Baker's wife nor mother believed that he was at risk of suicide. (Gayer Dep. 27:12-17, 76:1-3; Farmer Dep. 14:12-25, June 27, 2017, DN 41-6).

Baker made his final visit to the VA for treatment with his primary care physician, Dr. Mark Demuth ("Dr. Demuth"), on April 6, 2011. (Demuth Dep. 14:19-24, 31:4-6, June 21, 2017, DN 46-4; VA Medical Records 2). At this visit, Baker first expressed concerns for his mental health, stating that he felt like he was suffering from anxiety and requesting a screening for PTSD. (Demuth Dep. 30:23-25, 72:9-14). Dr. Demuth referred Baker for a "warm handoff"[1] to Donald Van Natta ("Van Natta"), a licensed clinical social worker in mental health. (Demuth Dep. 70:23-

---

[1] "A warm handoff is a handoff that is conducted in person, between two members of the health care team, in front of the patient (and family if present)." Agency for Healthcare Research & Quality, Warm Handoffs: A Guide for Clinicians, https://www.ahrq.gov/sites/default/files/wysiwyg/professionals/quality-patient-safety/patient-family-engagement/pfeprimarycare/warm-handoff-guide-for-clinicians.pdf (last visited May 9, 2019).

71-2).  At this point, Dr. Demuth was not concerned about suicide, noting that Baker had denied thoughts of suicide and was in a good mood that day.  (Demuth Dep. 71:3-11).

Following the handoff, Baker spent an hour with Van Natta.  (Van Natta Dep. 69:10-13).  Baker told Van Natta he did not want anyone to be involved in his treatment at the time of the in-person assessment.  (Van Natta Dep. 70:3-9).  Van Natta withheld creating a formal treatment plan until he received results of a follow-up assessment known as a behavioral health lab ("BHL") core assessment.  (Van Natta Dep. 64:12-17; Grantz Dep. 77:3-10).  Herman Kaiser ("Kaiser"), a behavioral health technician, conducted the BHL core assessment.  (Kaiser Dep. 15:2-14, June 21, 2017, DN 46-9).  Again, Baker answered in the negative to all questions concerning suicidal ideation.  (VA Medical Records 29-30).  Additionally, the assessment contained a PTSD checklist with 17 symptoms.  (VA Medical Records 28).  Of these, Baker reported he was bothered "not at all" to the symptoms, except as follows:

1.  Disturbing memories:  A little bit
2.  Disturbing Dreams:  A little bit
4.  Being upset:  A little bit
5.  Having physical symptoms:  A little bit
6.  Avoiding thoughts:  Extremely
7.  Avoiding activities:  Extremely
11. Feeling numb:  A little bit
13. Trouble sleeping:  A little bit
14. Irritable:  Quite a bit
16. Feeling Nervous:  A little bit
17. Easily Startled:  A little bit

(VA Medical Records 28).

After Baker concluded the in-person assessment and BHL core assessment, Van Natta followed up with a phone call on April 20, 2011, to discuss the results and potential treatment options.  Baker did not answer, however, so Van Natta left a message with his contact information.  (Van Natta Dep. 71:19-24).  Baker returned the call, but seemed irritable and stated he was not

interested in receiving services. (Van Natta Dep. 72:7-14). Van Natta testified that in these situations, it is his custom to ask the veteran refusing treatment if he could call back next week. (Van Natta Dep. 84:21-85:2). Van Natta cannot say for certain that he asked Baker that question, but he does recall that Baker's refusal of services was "a flat no." (Van Natta Dep. 85:3-4).

Following the phone conversation with Van Natta, Baker only returned to the VA when he needed care for conditions not related to mental health, including a visit for a hand injury in June 2011 and several other scheduled appointments that Baker missed. (*See, e.g.*, VA Medical Records 2, 4-6, 16-23). The last medical record mentioning Baker's mental health occurred when Baker received treatment for an ankle injury in September 2011. At that time, Baker denied wanting to harm himself or others. (VA Medical Records 11-12). Finally, the clinic cancelled a physical examination Baker had scheduled for November 9, 2011. (VA Medical Records 2).

On January 20, 2012, nine months after refusing to discuss PTSD treatment with Van Natta, Baker came to the VA for a compensation and pension ("C&P") examination with Dr. Brian Gallagher, Ph.D. ("Dr. Gallagher"). The examination related to a benefits application Baker filed seeking disability compensation for PTSD. (Gallagher Dep. 72:1-6, Apr. 21, 2017, DN 46-3). C&P examiners conduct forensic evaluations for purposes of disability determination but strive not to "blur the lines between treatment and disability" and as a result neither typically offer treatment nor form treating relationships with veterans. (Marsano Dep. 19:1-8, 91:2-5, Jan. 29, 2018, DN 46-15; Gallagher Dep. 23:19-20). The reasoning for this is that C&P personnel do not want to risk interfering with a veteran's relationship with his treating sources. (Gallagher Dep. 23:9-13). Examiners will, however, offer treatment if the veteran is not yet enrolled in any services with the VA, or if the veteran is in crisis and restrictive intervention is necessary. (Gallagher Dep. 23:21-24:5). Baker was already receiving treatment from the VA, so the first exception to the

general rule did not apply. (Gallagher Dep. 24:6-10). As for the second exception, Baker appeared neatly groomed, spoke well, and was cooperative, relaxed and attentive, so that he did not appear to be in crisis. (VA Medical Records 10). Dr. Gallagher did note, however, that Baker seemed a little down, perhaps as though he were not in a good mood or was not happy about performing the evaluation. (VA Medical Records 10; Gallagher Dep. 103:1-13).

Dr. Gallagher indicated that Baker had been exhibiting symptoms including difficulty sleeping, loss of interest in activities, hypervigilance, exaggerated startle response, avoidance of social gatherings, job stress, and stress related to the trauma Baker suffered in Iraq. (VA Medical Records 10-11). Dr. Gallagher ultimately concluded that Baker's symptoms created mild or transient occupational or social impairment, and these symptoms were consistent with mild PTSD. (VA Medical Records 11). Five days after his C&P evaluation with Dr. Gallagher, Baker returned for a C&P evaluation for his eye on January 25, 2012. (VA Medical Records 2, 7-9). Baker never returned to the VA for any reason after this visit. (*See* VA Medical Records 2).

Baker did seek treatment from other sources. In March 2012, Baker visited Marinetta Van Lahr ("Van Lahr"), APRN, whom his wife had seen for medical care for as long as she could remember. (Farmer Dep. 102:2-16). Baker went to see Van Lahr after his wife confronted him about his worsening drinking problem and anxiety. (Farmer Dep. 102:15). Records from his initial visit, however, fail to reveal any significant psychiatric disturbance. (Chambliss Medical Records 6, DN 41-11; Van Lahr Dep. 39:4-40:3, Nov. 16, 2017, DN 41-17).[2]

The first reference to psychiatric issues in Baker's treatment with Van Lahr appears in a note from a visit on November 6, 2012. (Chambliss Medical Records 6). Baker was concerned

---

[2] While Farmer testified the visits to Van Lahr began as a result of Baker's worsening drinking and anxiety, she also testified that he would see Van Lahr when he was sick. Van Lahr's records reflect that this visit was related to a routine physical illness rather than a mental health issue.

about PTSD and reported increasing anxiety, experiencing temper control issues, and waking up with flight of thought. (Chambliss Medical Records 6). Van Lahr could not recall whether it was months or years that Baker's anxiety had been worsening, or whether Baker or his wife had relayed that information. (Van Lahr Dep. 40:4-41:9).

As a result of that visit, Van Lahr gave Baker a prescription for an antidepressant and suggested cognitive behavioral therapy. (Van Lahr Dep. 16:8-20). Van Lahr also requested that Baker follow up in three weeks, but he did not. (Van Lahr Dep. 37:14-20). Moreover, Van Lahr provided Baker with a business card of a counselor in the same practice group, Bonnie French, ("French"). (Van Lahr Dep. 20:21-25). French submitted a declaration that she keeps regular records, searched those records, and determined Baker never visited her office for the suggested therapy. (French Decl. 1, DN 41-16).

Baker's final visit to Van Lahr's office came on May 29, 2013, when he presented with poison ivy but also noted he was still battling anxiety, depression, and PTSD daily. (Chambliss Records 1, 5; Van Lahr Dep. 65:1-67:3). Baker was given a steroid shot for the poison ivy, and his Paxil dosage was increased. (Van Lahr Dep. 65:7-10, 97:8-19). Baker was scheduled to follow up in one month, but he never returned. (Van Lahr Dep. 71:23-25; 32:23-25). Baker committed suicide almost three months later on August 19, 2013. (Compl. ¶ 1).

While Baker was prescribed Paxil and received various treatments relating to PTSD, anxiety, and depression, there are no indications in the record that Baker was so psychiatrically disturbed that he objectively appeared to be an imminent harm to himself. Van Lahr testified, for instance, that she never had reason to believe this was the case. (Van Lahr Dep. 30:15-23). As noted above, Baker's mother and wife were shocked by his suicide and could identify no signs suggesting he was at risk. (Gayer Dep. 27:12-17, 76:1-3; Farmer Dep. 14:12-25).

Baker had started a new job in early 2013 that required him to travel a great deal. (Farmer Dep. 92:18-24). According to Baker's friend and coworker, Jerry Sanders ("Sanders"), the job was difficult and dangerous, requiring repair of machines weighing up to thirty-two tons. (Sanders Dep. 18:1-9, Nov. 15, 2016, DN 41-13). In addition, because the only times that production stopped in the factories where Baker was conducting repairs fell on holidays, Baker's work took him from his family on every holiday except Christmas. (Sanders Dep. 17:10-19). Baker's wife testified that he was hoping to change jobs to be able to spend more time at home. (Farmer Dep. 16:22-17:1).

Sanders testified regarding some of Baker's behaviors that appeared out of the ordinary and occurred mere days before Baker's suicide. First, Sanders described an incident in Michigan the night before Baker's death in which Baker knocked down a photographer for seemingly no reason. (Sanders Dep. 34:10-36:1). Next, Sanders noted that on the day of Baker's suicide, Sanders and Baker went to a Longhorn Steakhouse for dinner. (Sanders Dep. 33:11-13). The two went after work, and Sanders said Baker's custom was to clean-up after work before going to dinner, but on that night he did not, which Sanders described as out of the ordinary. (Sanders Dep. 33:7-19). Finally, after dinner, Baker asked Sanders to go out drinking with him. (Sanders Dep. 33:24-34:1). Sanders told Baker he was too tired but invited him to come drink beer and watch TV in Sanders' hotel room. (Sanders Dep. 32:7-13). At this point, Baker told Sanders that he did not want to be alone. (Sanders Dep. 32:14:23). While at the time, the comment did not set off any alarms, Sanders said in retrospect Baker's comment about not wanting to be alone was out of character and indicated Baker "was battling with something." (Sanders Dep. 32:1-5). These few signs, occurring within forty-eight hours of Baker's suicide and identified by Sanders as out of

character only with the benefit of hindsight, are the only expressions by any witness that Baker was critically mentally ill.

## II.   JURISDICTION

The Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1346(b).

## III.   STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

## IV.    DISCUSSION

As noted above, Plaintiff's claim is brought under the Federal Tort Claims Act ("FTCA"). As this Court has explained, "[t]he FTCA often requires courts to apply both state and federal law to the same claims. 'First, the district court applies local law to determine liability and to assess damages. Second, federal law is invoked to bar proscribed recoveries, such as punitive damages.'" *Zion v. United States*, 913 F. Supp. 2d 379, 383 n.3 (W.D. Ky. 2012) (quoting *Kirchgessner v. United States*, 958 F.2d 158, 159 (6th Cir. 1992)). Because the alleged malpractice occurred in Kentucky, the Court will apply Kentucky law in addressing Plaintiff's claim but will apply federal law to issues of immunity and other bars to recovery.

### A.    Statutory Defenses to Claims

"The FTCA provides 'a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment.'" *Zion*, 913 F. Supp. 2d at 383 (quoting *United States v. Orleans*, 425 U.S. 807, 813 (1976)). Under the FTCA, federal courts have original jurisdiction to hear claims against the United States based on the negligence of its employees and agencies. *See* 28 U.S.C. § 1671. In its motion, Defendant raises various defenses.

#### 1.    *Discretionary Function*

One defense raised by Defendant is the discretionary function exception. (Def.'s Mem. Supp. Mot. Summ. J. 24-25, DN 41-1 [hereinafter Def.'s Mot.]). Under this exception, the United States is not liable for any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). As the Supreme Court has stated, conduct falls within the discretionary function exception if it satisfies a

two-pronged test:  (1) the conduct at issue must be discretionary, "involv[ing] an element of judgment or choice;" and (2) the conduct must involve a "judgment of the kind that the discretionary function exception was designed to shield." *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (citation omitted).

Conduct involves an element of judgment or choice for purposes of the first prong of the discretionary function exception when no "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.*; *see also Shrieve v. United States*, 16 F. Supp. 2d 853, 856 (N.D. Ohio 1998).  For the second prong, a judgment is the kind Congress intended to shield with the discretionary function exception when review involves "judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Berkovitz*, 486 U.S. at 537 (citation omitted).  If the "nature of the actions taken . . . are susceptible to policy analysis," then the second prong is satisfied. *United States v. Gaubert*, 499 U.S. 315, 325-26 (1991).

While Defendant has shown that the VA has a policy prohibiting Dr. Gallagher (or any C&P examiner) from developing a treatment relationship with an examinee, it has failed to establish that Dr. Gallagher's conduct involved an element of judgment or choice as required by the first prong. *See Berkovitz*, 486 U.S. at 536.  The conduct at issue, Dr. Gallagher's alleged inadequate treatment of Baker, is conduct prohibited by the relevant policy.  Defendant cannot argue on the one hand that Dr. Gallagher was expressly prohibited from treating Baker and on the other that his actions involved an exercise of discretion.  The Sixth Circuit has recognized this inconsistency and instructed that courts should consider "'whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice.  If so, the discretionary function exception does not apply' because 'the employee had no rightful option but

to adhere to the directive' and thus 'there was no element of judgment or choice in the complained of conduct.'" *Sharp ex rel. Estate of Sharp v. United States*, 401 F.3d 440, 443 (6th Cir. 2005) (quoting *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997)). Such is the case here. Defendant has established that VA policy prohibited Dr. Gallagher from treating Baker. As a result, Dr. Gallagher did not exercise judgment or choice in deciding not to treat Baker. The discretionary function exception therefore does not apply.

### 2. *38 U.S.C. § 511*

Defendant also relies on a statutory defense to Plaintiff's claims. (Def.'s Mot. 25). Under 38 U.S.C. § 511, the VA's determinations as to compensation and benefits "shall be final and conclusive and may not be reviewed by any other official or by any court, whether by an action in the nature of mandamus or otherwise." 38 U.S.C. § 511(a). Thus, Congress has specifically precluded judicial review of benefits claims by Article III courts. Instead, "[t]he exclusive avenue for redress of veterans' benefits determinations is appeal to the Court of Veterans Appeals and from there to the United States Court of Appeals for the Federal Circuit." *Price v. United States*, 228 F.3d 420, 421 (D.C. Cir. 2000) (citations omitted). Defendant contends Section 511 therefore precludes this Court from considering Dr. Gallagher's actions (as C&P examiner) when assessing Plaintiff's medical negligence claim.

While Defendant contends that the decision in *Philippeaux v. United States*, No. 10 CIV. 6143-NRB, 2011 WL 4472064 (S.D.N.Y. Sept. 27, 2011), supports this defense, that court construed a portion of the *pro se* complaint as an attempted appeal of a denial of benefits by the VA and noted that Section 511 precluded a review of the denial. *See id.* at *5. In addition, that court dismissed the medical malpractice claim because the plaintiff failed to allege facts sufficient to establish a treating relationship between the plaintiff and the C&P examiner. *See id.* at *8.

Defendant has not provided a case in the Sixth Circuit or otherwise where a court has demonstrated its willingness to extend Section 511's coverage to any situation other than that which its plain language covers, the VA's denial of a veteran's C&P benefits.

The Court will not interpret Section 511 to mean anything other than what it says. Plaintiff is not appealing the VA's benefits determination and is instead alleging medical negligence on the part of Dr. Gallagher, among others. Jurisdiction is not precluded by Section 511.

### B.    Merits of Claims

The claims asserted in this action are for medical malpractice by Dr. Gallagher, Van Natta, and Kaiser. (Pl.'s Suppl. Expert Discl. 1-2, 6, DN 41-18). Under Kentucky law, "[a] medical negligence case, like any negligence case, requires proof that: (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached the standard by which his or her duty is measured; and (3) consequent injury." *Jenkins v. Best*, 250 S.W.3d 680, 688 (Ky. App. 2007).

#### 1.    *Duty*

First, the Court must determine whether Plaintiff can establish the existence of a duty owed to Baker, which is a question of law. *See id.* at 688 (citing *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003)). Under Kentucky law, "[t]he physician's duty to a patient arises when, by his words or deeds, 'he agrees to treat a patient, thus establishing a physician/patient relationship.'" *Id.* (quoting *Noble v. Sartori*, 799 S.W.2d 8, 9 (Ky. 1990)). As discussed above, Dr. Gallagher was not involved in the treatment of Baker and was prohibited by policy from forming such a treating relationship. (Marsano Dep. 19:1-8, 91:2-5; Grantz Dep. 95:15-17; Gallagher Dep. 23:4-20). Other courts to consider the matter have concluded that a C&P examiner does not owe a duty of care to patients commensurate with a treating physician. *See, e.g.*, *Philippeaux*, 2011 WL 4472064, at *8 (dismissing medical negligence claim against C&P examiner where plaintiff could

not establish physician/patient relationship); *Kennedy v. United States*, No. 91-30204-F, 1993 WL 666704, at *5 (D. Mass. Dec. 15, 1993) (concluding the C&P examiner owed the plaintiff a duty only not to cause him harm during his examination").

Plaintiff has failed to establish the existence of a treating relationship between Dr. Gallagher and Baker.[3] Dr. Gallagher saw Baker solely for a disability evaluation and was prohibited from providing any treatment. Absent some extraordinary circumstances not presented here, Dr. Gallagher cannot be held responsible for a person he was duty-bound *not* to treat as a patient. Absent a duty, Plaintiff can have no viable negligence claim related to Baker's evaluation by Dr. Gallagher. *See Ashcraft v. Peoples Liberty Bank & Tr. Co.*, 724 S.W.2d 228, 229 (Ky. App. 1986) ("If no duty is owed by the defendant to the plaintiff, there can be no breach thereof, and therefore no actionable negligence."). With respect to Plaintiff's claims regarding Dr. Demuth, Van Natta, and Kaiser, each was involved with some aspect of Baker's treatment. The Court will presume that each owed a duty to perform their respective functions capably.

---

[3] Defendant also argues that Baker's suicide was unforeseeable. (Def.'s Mot. 35-36). As the Kentucky Supreme Court has noted, "[t]he most important factor in determining whether a duty exists is foreseeability." *Hammons*, 113 S.W.3d at 89 (internal quotation marks omitted) (citation omitted). Kentucky has adopted the Restatement's definition of foreseeability, which focuses on the defendant's knowledge at the time of the alleged negligent act. *See id.* at 90. "The actor is required to recognize that his conduct involves a risk of causing an invasion of another's interest if a reasonable man would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence, and judgment as a reasonable man would have." *Id.* (internal quotation marks omitted) (emphasis omitted) (citing Restatement (Second) of Torts § 289(a)). Contrary to Defendant's arguments, the question of foreseeability is not whether the exact harm that occurred was foreseeable, but instead whether a risk of some harm existed stemming from the relationship between physician and patient. *See Lee v. Farmer's Rural Elec. Co-op. Corp.*, 245 S.W.3d 209, 212 (Ky. App. 2007) ("Whether a harm was foreseeable in the context of determining duty depends on the general foreseeability of such harm, not whether the specific mechanism of the harm could be foreseen." (citations omitted)). Foreseeability is simply a tool used to assess whether a defendant owed any duty of care to the plaintiff. As previously noted, it is settled law in Kentucky that a duty of care arises from the physician/patient relationship but no such relationship existed between Baker and Dr. Gallagher. *See Jenkins*, 250 S.W.3d at 688.

## 2. *Breach of a Duty*

The second element of a medical malpractice claim is the breach of a duty. *See Jenkins*, 250 S.W.3d at 688. As the Kentucky Supreme Court has explained:

> In any negligence case, it is necessary to show that the defendant failed to discharge a legal duty or conform his conduct to the standard required. In the arena of medical negligence, controlling Kentucky authority imposes upon a physician the duty to "use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which [the physician] belongs acting in the same or similar circumstances.'"

*Mitchell v. Hadl*, 816 S.W.2d 183, 185 (Ky. 1991) (internal citation omitted) (quoting *Blair v. Eblen*, 461 S.W.2d 370, 373 (Ky. 1970)).

"Except in limited factual circumstances, . . . the plaintiff in a medical negligence case is required to present expert testimony that establishes (1) the standard of skill expected of a reasonably competent medical practitioner and (2) that the alleged negligence proximately caused the injury." *Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. App. 2006). Where an expert's opinion fails to set forth the standard of care or establish an evidentiary basis for its breach, summary judgment is appropriate. *See id.*; *see also Partin v. Tilford*, No. 5:13-CV-00193-CRS, 2016 WL 3212248, at *2 (W.D. Ky. June 7, 2016) (quoting *Andrew*, 203 S.W.3d at 165).

To prove a breach, Plaintiff proffers the expert testimony of a psychiatrist, Dr. Keyhill Sheorn ("Dr. Sheorn"). Dr. Sheorn's initial report alleges "numerous deviations from the standard of care," but Dr. Sheorn never establishes that standard. (Pl.'s Expert Discl. 5, DN 18-1). Dr. Sheorn notes, for instance, that on October 27, 2010, Baker was seen by a primary care nurse after a motor vehicle accident. (Pl.'s Expert Discl. 1). A note indicated possible PTSD, and Dr. Sheorn states Baker "was referred to the Behavior Health Lab but was not referred directly to a psychiatrist." (Pl.'s Expert Discl. 1). Nowhere does Dr. Sheorn state, however, that a reasonably competent medical provider would routinely refer the patient directly to a psychiatrist in a similar

situation. Dr. Sheorn likewise neither provides any explanation what the standard of care is nor why the referral to the BHL violates that standard. As a result, the Court can draw no inference from Dr. Sheorn's statement other than the fact that Baker was referred to the BHL.

Similarly, Dr. Sheorn notes that Baker's primary care provider, Dr. Demuth, requested a mental health consultation for possible PTSD on April 6, 2011, but did not refer Baker directly to a psychiatrist. (Pl.'s Expert Discl. 2). Dr. Sheorn fails to state whether a reasonably competent medical professional in Dr. Demuth's position would have eschewed the mental health consultation for a direct referral to a psychiatrist. Thus, the Court can draw no inference that this behavior violated the standard of care.

Plaintiff's response claims that her own counterstatement of the facts demonstrates numerous deviations from the standard of care. (Pl.'s Resp. Def.'s Mot. Sum. J. 2, DN 46 [hereinafter Pl.'s Resp.]). But Plaintiff's construction of the facts underlying its cause of action is no substitute for expert testimony. The best Plaintiff offers is a recitation of Dr. Sheorn's seven alleged failures with the addition by counsel of a statement that each of them violates the standard of care. (Pl.'s Resp. 23). Simply stating that the VA employees' actions violated the standard of care, however, does not suffice. *See Moore v. U.S. Dep't of Agriculture*, No. 17-5363, 2018 WL 1612299, at *3 (6th Cir. Jan. 31, 2018) (concluding that summary judgment was appropriate where expert "failed to set forth the applicable standard of care and provided only a two-sentence conclusory statement that the defendants breached the standard of care 'by failing to provide timely and proper medical treatment,' and that the breach was the direct and proximate cause of the partial amputation of Moore's left pinky finger.").

Dr. Sheorn also appears to opine that the VA should have relied on a measure of PTSD set forth in the Diagnostic and Statistical Manual ("DSM"). (Pl.'s Suppl. Expert Discl. 1-2, 6). This

opinion lacks any explanation that checklists located in or culled from the DSM represent the standard of care. Rather, Dr. Sheorn simply opines that Baker's score on one examination was below the cutoff for the military checklist but would have met the requirements of PTSD on an examination based on the DSM. (Pl.'s Suppl. Expert Discl. 6). Dr. Sheorn also notes that many consider the DSM to be the "psychiatrist's Bible" and that the DSM is readily available. (Pl.'s Suppl. Expert Discl. 1-2). Notably, Dr. Sheorn does not explain how the VA's examinations are conducted or discuss the standard for performing such examinations. Therefore, this testimony also fails to establish a standard of care and explain the VA's breach thereof.[4]

Dr. Sheorn further opines that the VA violated the standard of care by allowing employees who were not psychiatrists to screen Baker for PTSD in contravention of the VA's policies. (Pl.'s Expert Discl. 1). This assertion, however, fails as a matter of law to establish the standard of care. Under Kentucky law, policies and procedures do not, in and of themselves, establish the standard of care. *See Lake Cumberland Reg'l Hosp., LLC v. Adams*, 536 S.W.3d 683, 696 (Ky. 2017); *Flechsig v. United States*, 991 F.2d 300, 304 (6th Cir. 1993). The reasoning for this approach is straightforward: to hold that an institution's own policies and procedures create the standard of care would perversely incentivize institutions to adopt only what is legally required. *See Flechsig*, 991 F.2d at 304; *Finn v. Warren Cty.*, 768 F.3d 441, 451 (6th Cir. 2014). Thus, without

---

[4] In her response, Plaintiff also argues the VA failed in its duty to diagnose and treat Baker's traumatic brain injury ("TBI"). (Pl.'s Resp. 25). Dr. Sheorn's initial report does not mention TBI. Dr. Sheorn's second report does so very briefly in the context of criticizing Dr. Gallagher's C&P evaluation. (Pl.'s Suppl. Expert Discl. 5). As previously noted, however, Dr. Gallagher's handling of the C&P evaluation cannot form the basis for liability because he saw Baker for disability evaluation only.

establishing the applicable standard of care, proof that the VA failed to comply precisely with its own internal policies is insufficient to prove the breach of a duty to support Plaintiff's claims.[5]

### 3. *Causation*

Finally, "[i]t is beyond dispute that causation is a necessary element of proof in any negligence case." *Baylis v. Lourdes Hosp., Inc.*, 805 S.W.2d 122, 124 (Ky. 1991) (citations omitted). In assessing medical testimony, "substance should prevail over form[,]" and "the total meaning, rather than a word-by-word construction, should be the focus of the inquiry." *Id.* (citations omitted).

Kentucky employs the substantial factor test from the Restatement (Second) of Torts, asking whether the defendant's conduct was a substantial factor in causing the plaintiff's harm. *See Tennyson v. Brower*, 823 F. Supp. 421, 423 (E.D. Ky. 1993) (collecting cases). "Causation is an element which may be proved by circumstantial evidence, and in that situation 'the evidence must be sufficient to tilt the balance from possibility to probability.'" *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 537 (6th Cir. 1995) (citations omitted). Factors to consider include:

> (a)  the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
> (b)  whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;
> (c)  lapse of time."

*Tennyson*, 823 F. Supp. at 424 (quoting Restatement (Second) of Torts § 431 cmt. a (1965)).

---

[5] While Plaintiff argues that there is a question of fact as to whether the VA failed in its duty to screen Baker annually for PTSD for the first five years following his deployment while he was receiving VA care, Dr. Karen Grantz testified the records reflect that Baker received his screening annually for the entire time he was receiving care from the VA. Plaintiff has not refuted this contention. (Pl.'s Resp. 25; Grantz Dep. 40:13-17). Likewise, Plaintiff's expert again fails to establish that this alleged breach occurred or that it contributed to Baker's suicide. Plaintiff cannot argue that factual issues preclude summary judgment where her own expert has failed to address the relevant facts. *See Blankenship v. Collier*, 302 S.W.3d 665, 667 (Ky. 2010).

The issue therefore becomes whether Plaintiff's expert reports, read in the light most favorable to Plaintiff, offer sufficient evidence such that a reasonable juror could believe Defendant's conduct was a substantial factor in causing Baker's suicide.  Dr. Sheorn refers to this situation as an example of "the Swiss cheese model of medical error."  (Pl.'s Expert Discl. 1).  By that, Dr. Sheorn explains that she cannot identify one act that was independently responsible for causing the harm, but instead several smaller things went wrong, creating holes like Swiss cheese, and Baker fell through the holes.  (Pl.'s Expert Discl. 1).  Dr. Sheorn enumerates seven steps, which appear to be bases for liability.  (Pl.'s Expert Discl. 1-2).

The Court notes that Dr. Sheorn offers no explanation for how the VA's alleged violations of the standard of care are affected by the two-year gap between Baker's final contact with the VA and his suicide.  Given that lapse of time is an express factor to assess when determining causation, the failure to address this issue weighs against Plaintiff.  Dr. Sheorn's sole reference to the care Baker received following his final contact with the VA was that Baker's decision to go elsewhere for care evidenced the VA's failures.  (Pl.'s Expert Discl. 5).

The substantial gap between Baker's last contact with the VA and his suicide is also relevant to the second factor:  "whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible . . . ."  *Tennyson*, 823 F. Supp. at 424 (quoting Restatement (Second) of Torts § 431 cmt. a).  Dr. Sheorn's report does not explain how the VA's alleged failures led to Baker's death twenty-eight months after he last had any contact with it.

Dr. Sheorn also does not address the fact that Baker refused treatment which the VA offered him.  The report likewise does not mention that Van Lahr, Baker's private care provider, offered

Baker the contact information for a therapist, but Baker did not avail himself of those services. Nor did Baker follow up three weeks later as Van Lahr requested. The report further ignores the fact that Baker started taking the antidepressant Paxil, prescribed by Van Lahr, and Baker's Paxil prescription was subsequently altered. Dr. Sheorn does not address the added stress of Baker's new job, started in early 2013, requiring him to be on the road most of the time, and involving long hours repairing heavy equipment. These other factors all weigh strongly against the notion that the VA interaction with Baker, which ceased at Baker's election in April 2011, constituted a continuous and active force at the time of Baker's suicide in August 2013.

Dr. Sheorn's only mention of causation is the conclusory allegation that the VA's failures "were the direct and proximate cause of the suicide of Cody Baker." (Pl.'s Expert Discl. 5). In her supplemental report, she ultimately concludes:

> In summary, Cody Baker might hold some responsibility for his neglect and subsequent death if we could trust his self-assessment, which we can't. Maybe he would be responsible if his judgment were sound; which it was not, or if he could be relied upon to follow-up and pursue a higher level of care, which he could not. It is not disputed that Cody Baker's judgement [sic] was unsound due to despair and alcohol. His thinking was confounded by the very symptoms that he was seeking help for. His cognitive abilities were compromised by isolation of affect, dissociation, chronically impaired sleep, and alcohol. Cody Baker was not able to be his own advocate and no one at the VA stood up for him and documented that he needed a specialized level of care.
>
> Based on my extensive review and my opinions above, I can state, with a degree of reasonable medical probability, that Mr. Van Natta, Dr. Gallagher and Mr. Kaiser, at a minimum, deviated from the applicable standard of care and that such deviations were a direct and/or proximate cause of the death of Cody Baker.

(Pl.'s Suppl. Expert Discl. 11). No explanation, however, is provided by Dr. Sheorn how any action or inaction by VA was a substantial factor in causing the suicide, only the final conclusory sentence. Most significantly, there is no connection identified by Plaintiff's expert between any action or inaction by Dr. Demuth, Van Natta, or Kaiser and Baker's suicide over two years later.

As with every element of a medical negligence claim, a plaintiff must demonstrate through expert testimony that the defendant's actions were the cause of the plaintiff's harm, and where the opinion does not create a probable inference of causation, summary judgment is appropriate. *See Jackson v. Ghayoumi*, 419 S.W.3d 40, 45 (Ky. App. 2012). Absent sufficient expert testimony to support Plaintiff's claims, Defendant is entitled to summary judgment.

## V. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (DN 41) is **GRANTED**.

Greg N. Stivers, Chief Judge
United States District Court

May 13, 2019

cc: counsel of record